UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Jason Meinelt, | § | CIVIL ACTION NO. 10-311 |
|     Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| P.F. Chang's China Bistro, Inc., | § | |
|     Defendant | § | A JURY IS DEMANDED |

## Plaintiff's Original Complaint

Three days after Jason Meinelt advised P.F. Chang's that he had been diagnosed with a brain tumor, P.F. Chang's fired him from his job. Sadly, the facts show that Mr. Meinelt would still be a valued employee of P.F. Chang's today if he had not told the company about this disability.

### PARTIES

1. The plaintiff is an individual who resides in Houston, Harris County, Texas.

2. The defendant, P.F. Chang's China Bistro, Inc., is a Delaware corporation that may be served by serving its registered agent, National Registered Agents, 16055 Space Center, Suite 235, Houston, Texas 77062.

### JURISDICTION

3. This case is brought under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. and the Family and Medical Leave Act, 29 U.S.C § 2601 et seq. This Court has jurisdiction of this case according to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

4. Venue is invoked pursuant to 28 U.S.C. § 1391.

1

STATEMENT OF THE PLAINTIFFS' CASE

5. Jason Meinelt worked for the defendant for almost four years and was a dedicated and productive manager. He would still be working for the defendant today if he had not been diagnosed with a brain tumor in June of last year. While he hoped for cooperation and understanding when he told his superior that he would need to take leave to have surgery and recuperate, he instead found himself out of a job almost as soon as the company learned of his condition. He was in shock at losing, not only his job, but also the medical benefits that were desperately needed for the expensive medical treatment he was facing. These benefits were also vital to his wife, who, as the company knew, was four months pregnant at the time.

6. During his years of employment with P.F. Chang's, Mr. Meinelt worked hard for the organization's success. He has fine interpersonal skills, was eminently fair in his dealings with employees, and has a strong work ethic. He was precisely the kind of person that any company wants in management. One very strong example of this comes from the very person who dismissed him, Glen Piner, Houston Regional Manager. Early last year, Mr. Piner was in Houston conducting a round table event, where he meets with a variety of employees to ascertain how management is doing at running the restaurant. After he completed the round table, Mr. Piner told Mr. Meinelt that no employee had a single negative thing to say about him. Mr. Piner also said this was the first time he had conducted a round table without hearing even a single complaint about a manager.

7. Nor was this an isolated event. Mr. Meinelt was regularly recognized for his fine work. In the spring of 2009, he was roundly thanked for his careful work that caught a contractor stealing property, allowing the company to extract itself from an expensive and

problematic contract.  Indeed, on the very day Mr. Meinelt was diagnosed with a brain tumor, Mr. Piner sent out an email with performance results for the Houston restaurant and Mr. Meinelt was recognized by name – "great job Jason" – for the way he handled alcohol costs.

8.  But everything changed when Mr. Piner learned of Mr. Meinelt's brain tumor from Operating Partner Michael Brown.  Brown learned of the tumor on Monday, June 8th and told Piner about it.  On Wednesday, Piner called Mr. Meinelt and demanded a meeting.  Mr. Meinelt was at Methodist Hospital getting further testing and could not drive after the tests were administered.  Mr. Piner agreed to meet the following morning, June 11th.  This meeting turned out to be his termination meeting.

9.  Naturally, Mr. Piner did not tell Mr. Meinelt that he was being terminated because he had a brain tumor.  Instead of confessing his real motivation, Mr. Piner came up with a pretext – he claimed that Mr. Meinelt broke company policy by clocking employees out and rolling back their hours.  When Mr. Piner explained that this practice necessitated Mr. Meinelt's termination, Mr. Meinelt explained that he had been doing this for years, at the express instruction of each direct supervisor he has had during his tenure at the restaurant.  Mr. Piner did not respond to this statement and there is a good reason for that.  Mr. Piner knew quite well that others, including Mr. Meinelt's direct supervisor, Michael Brown, were engaging in the same practice.  Indeed, just the previous week, Mr. Piner had told Brown that he knew the chefs, who were not fired, were following this practice.  So, instead of responding to Mr. Meinelt's statement, Mr. Piner just repeated that it was against company policy.  He said that his hands were tied.  Mr. Meinelt was stunned.

10. Mr. Meinelt had only clocked people out when they had forgotten to do so or when they deliberately failed to do so – a practice called "riding the clock." After all, he was required to complete daily company reports about such things as labor costs and, obviously, he could not accurately complete such reports if individuals who were no longer at work or were finished work and just hanging out at the restaurant were improperly still listed as currently working. Thus, as Mr. Meinelt was instructed by two separate supervisors, he clocked employees out under his own name when they neglected to clock out and then checked with them to verify that the time he noted was correct. And even though Mr. Piner knew that this practice was widespread and indeed followed by Mr. Meinelt's direct supervisor, he singled out for dismissal a man who was facing surgery for a brain tumor.

11. After losing his job, Mr. Meinelt applied for unemployment benefits and was amazed when he saw the records produced by the company in an effort to deny him even the modicum of support that unemployment compensation provides. The company produced documentation showing that numerous other managers had committed the same conduct for which he lost his job, but these individuals kept their jobs. After seeing this information, the Texas Workforce Commission ruled that Mr. Meinelt had a valid claim for unemployment benefits. Indeed, the Texas Workforce Commission representative expressed her shock to Mr. Meinelt that any company would claim misconduct when their own internal documents showed that they tolerated the same conduct for numerous other managers.

12. Instead of suffering any penalty for the conduct that allegedly cost Mr. Meinelt his job and badly needed benefits, all the other managers were simply told that they needed to follow a new policy of clocking the person out, but ensuring that the employees goes back the

following day and clocks out at the precise time they left. So, the only person who was punished for this widespread practice was the person who had just told the company that he needed time off for brain surgery and recuperation.

13. Meinelt filed a charge of discrimination with the EEOC to challenge the disability discrimination he faced. He now timely files his lawsuit after receiving a right-to-sue letter from the EEOC.

## Disability Discrimination

14. The plaintiff is a qualified individual with a disability. The plaintiff performed his managerial job well, but lost it as soon as the company learned he had been diagnosed with a brain tumor, which is an actual disability under the Americans with Disabilities Act. In addition, Mr. Meinelt was regarded as having a disability by the defendant and was discharged as a result.

## Violation of Family and Medical Leave Act

15. One reason that the Family and Medical Leave Act was enacted was to protect people facing serious medical conditions from dismissal when they needed time off to deal with their medical issues. Sadly, as soon as P.F. Chang's learned that Mr. Meinelt would need time off for his brain surgery, it preemptively fired him to deny him that leave. This clearly interfered with Mr. Meinelt's right to leave and thus violates the FMLA.

## Damages

16. The damages suffered by the plaintiff include lost wages and benefits as well as compensatory damages for the injuries suffered at the hands of the defendant, including, but not limited to, mental anguish.

5

17. Further, the plaintiff seeks an award of exemplary damages for his ADA claim because the defendant's actions were of the sort that render the imposition of exemplary damages appropriate,

18. And, because the defendant's actions were willful and thus render the imposition of liquidated damages appropriate, the plaintiff is entitled to an award of these damages under the FMLA.

## RELIEF REQUESTED

The plaintiff asks this court to enter a judgment:

1. Declaring that the acts and practices complained of in this Complaint are in violation of the Americans with Disabilities Act and the Family and Medical Leave Act;

2. Enjoining and permanently restraining these violations of law;

3. Directing the defendant to pay the plaintiff actual and compensatory damages that he suffered, past and future;

4. Ordering that the plaintiff be reinstated or, in the alternative, awarded front pay;

5. Directing the defendant to pay plaintiff exemplary damages for its conduct in an amount as yet to be ascertained;

6. Directing the defendant to pay plaintiff liquidated damages for its conduct in an amount as yet to be ascertained;

7. Awarding plaintiff pre-judgment interest on the amounts owed at the maximum rate allowed by law;

8. Awarding plaintiff the costs of this action, together with reasonable attorneys' fees and expert witness fees;

9.  Awarding plaintiff post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law; and

10.  Awarding plaintiff such other relief, legal or equitable, as may be warranted.

    Respectfully submitted,

s/ Katherine L. Butler *
Federal I.D. No. 4734
State Bar No. 03526300
Paul R. Harris
Federal I.D. No. 897365
State Bar No. 24059905
1007 Heights Boulevard
Houston, Texas  77008
(713) 526-5677
Fax (713) 526-5691

**\*Attorney in charge for Plaintiff**