UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Jason Meinelt, | § | CIVIL ACTION NO. 10-311 |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| P.F. Chang's China Bistro, Inc., | § | |
| Defendant | § | A JURY IS DEMANDED |

**Plaintiff's Response to Defendant's Motion for Summary Judgment**

TABLE OF CONTENTS

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The (Various) Stories According to P.F. Chang's – and the Flaws Therein . . . . . . . . . . . . . . . 6
    1. Was Time Editing Unusual? No. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    2. Did Meinelt's Editing Practices Change Over Time? No. . . . . . . . . . . . . . . . . . . 7
    3. Was The Editing News to Piner? No. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    4. Did the Audit Show Only Meinelt Editing Time? No. . . . . . . . . . . . . . . . . . . . . . 7
    5. Should Meinelt Have Adopted a Different Approach? No. . . . . . . . . . . . . . . . . . . 8
    6. Was Meinelt's Tumor Unknown to P.F. Chang's at the Time of Termination? No. . . 9
    7. Did Piner Conduct a Thorough, Professional Audit? No. . . . . . . . . . . . . . . . . . . 9
    8. Did Piner Hold Others to The Same Standards? No. . . . . . . . . . . . . . . . . . . . 10
    9. Did the Employees Agree with Piner's Assessment? No. . . . . . . . . . . . . . . . . . 11
    10. Has Piner Explained His Destruction of Documents? No. . . . . . . . . . . . . . . . . 11
    11. Was Meinelt's Manager Ever Held Accountable? No. . . . . . . . . . . . . . . . . . . 12

Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    I. Judgment as a Matter of Law – Argument and Authorities . . . . . . . . . . . . . . . . . . . . 15
        A. Prima Facie Case of Disability Discrimination . . . . . . . . . . . . . . . . . . . . . . . 15
            (i) The Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            (ii) PF Chang's Regarded Meinelt As Disabled . . . . . . . . . . . . . . . . . . . . 17
            (iii) Meinelt's Actual Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        B. Alleged Work Rule Violations and The Absence of a Phantom Identical Twin
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
            (i) Piner's Accusation that Mienelt Violated the Rules is not Credible . . 19
            (ii) Piner Knew That Other Supervisors Edited Time – And Cut More
               Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        C. Pretext . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
            (i) Mendacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
            (ii) Refusing to Give the Benefit of the Doubt . . . . . . . . . . . . . . . . . . . . 22
            (iii) Changing Stories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
            (iv) Suspicious Timing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
            (v) The Absence of a Clear Cut Policy . . . . . . . . . . . . . . . . . . . . . . . . . 24
    II. Meinelt's Pretext Evidence Applies with Equal Force to His FMLA Claim . . . . . . 24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## TABLE OF AUTHORITIES

CASES

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Brown v. Kastle Systems of Texas, LLC,* 2010 WL 3342219 (S.D. Tex. Aug. 25, 2010) . . . . . . 15

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . 22

*Chamberlain v. Valley Health System, Inc.,* 2011 WL 560777 (W.D.Va. Feb. 8, 2011) . . . . . . 17

*Coburn v Rockwell Automation, Inc.*, 238 Fed.Appx. 112, 2007 WL 1892091 (6th Cir. 2007) . 22

*Darboe v. Staples, Inc.*, 243 F.Supp.2d 5 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Erdman v. Nationwide Ins. Co.,* 582 F.3d 500 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Evans v. City of Houston,* 246 F.3d 344 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Feldman v. Law Enforcement Associates Corp.*, 2011 WL 891447 (E.D.N.C., March 10, 2011)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gee v. Principi*,  289 F.3d 342 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Loveless v John's Ford, Inc.*, 232 Fed. Appx. 229 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 23

*Lowe v. American Eurocopter, LLC,* 2010 WL 5232523 (N.D.Miss., December 16, 2010 ) . . . 16

*Martin v. J.A.M. Distributing Co.,* 674 F.Supp.2d 822 (E.D.Tex. 2009) . . . . . . . . . . . . . . . . . 20

*Mauder v. Metropolitan Transit Authority*, 446 F.3d 574 (5th Cir. 2006) . . . . . . . . . . . . . . . . . 26

*Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086 (5th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . 19

*Pantoja v American NTN Bearing Manufacturnig Corp.*, 495 F.3d 840 (7th Cir. 2007) . . . . . . 23

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . 14, 21

*Reynolds v. Inter-Industry Conference on Auto Collision Repair*,  594 F.Supp.2d 925 (N.D.Ill.
2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

iv

*Sagaral v. Wal-Mart,* 516 F.Supp.2d 782 (S.D.Tex. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . 24

*Tambash v. St. Bonaventure University*, 2004 WL 2191566 (W.D.N.Y. Sept. 24, 2004) . . . . . . 25

*Tomczyk v Jocks & Jills Rests., LLC.*, 198 Fed. Appx. 804 (11th Cir. Aug. 9, 2006) . . . . . . . . 24

*Trujillo v. PacifiCorp*, 524 F.3d 1149 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wallace v DTG Corp, Inc.*, 442 F.3d 1112 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## STATUTES

29 C.F.R. § 1630.15(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

29 C.F.R. § 1630.2(j)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

29 U.S.C. § 2615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 U.S.C. § 12102(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

76 Fed. Reg. 16978-01 at 16985 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ADA Amendments Act of 2008 (ADAAA), Pub.L. 110-325, Section 2(b)(4-5), Sept. 25, 2008;
§12102(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Jason Meinelt, | § | CIVIL ACTION NO. 10-311 |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| P.F. Chang's China Bistro, Inc., | § | |
| Defendant | § | A JURY IS DEMANDED |

**Plaintiff's Response to Defendant's Motion for Summary Judgment**

The defendant does not show itself entitled to judgment under Rule 56. It construes the

facts in a manner most favorable to itself – the movant, when the law requires that the evidence

be viewed in a light most favorable to the non-movant, Jason Meinelt. It also relies on case law

developed before Congress made significant amendments to the Americans with Disabilities Act

– amendments designed to reject the legal theories on which P.F. Chang's relies.

**Statement of Facts**[1]

Meinelt filed this disability and FMLA case to challenge his abrupt dismissal only three

days after he revealed he had a brain tumor.  Before this revelation, Meinelt's career prospects at

P.F. Chang's were bright.  He had worked for the company for five years and in management at

the Westchase restaurant for four of those years. Ex 1, Jason Meinelt's Deposition Excerpts

(Meinelt Dep.) at 10. And he was well respected. Ex 2, Michael Brown's Declaration (Brown

Dec.) at ¶3; Ex 3, Charles Bersola's Declaration (Bersola Dec.) at ¶4-6; Ex 4, Shaun Thomas's

Declaration (Thomas Dec.) at ¶3.   Indeed, Glen Piner, Meinelt's second level supervisor who

---

[1] The plaintiff agrees with the defendant's statement of the nature and stage of the proceeding. Dkt. 30 at 1.

oversaw five restaurants,[2] told him in the spring of 2009 that not one of Meinelt's employees had a single negative thing to say about him.  Dkt. 1 at ¶6; Dkt. 8 at ¶6.  Piner held periodic roundtable discussions to gather employee feedback about managers and this was the first time no one had had even one complaint about a manager.

Meinelt was a dedicated employee who Piner admits was doing a "great job." Piner Dep. at 106.  Meinelt worked long hours without complaint – often closing the restaurant well after midnight. Ex 7, Michael's Brown's Deposition Excerpts (Brown Dep.) at 51-52.  And even on his days' off, he was focused on the company's business – doing tasks such as mowing the grass around the restaurant and painting. Thomas Dec. at ¶7.   As one of his subordinates, Shaun Thomas, puts it, Meinelt "really went above and beyond to support the restaurant's operation." *Id.*  He was a leader and a compassionate one.  Having come from the ranks himself, he worked *with* his staff  and they appreciated it – as the roundtable results make clear.  According to Thomas, "he was the staff's favorite manager." *Id.* at ¶ 3.

When Meinelt was given a task, he rose to the challenge.  For example, after being placed in charge of bar service at the restaurant, Meinelt achieved the best liquor cost results in years. Brown Dec. at ¶ 3.  And, in the Spring of 2009, Meinelt was also praised for gathering the evidence needed to discharge a dishonest contractor who was stealing property from the restaurant. Dkt 1 at ¶ 7; Dkt. 8 at ¶ 7.

Meinelt's hard work caught the attention of customers as well and a number of them spontaneously offered glowing feedback on his performance.  Ex 6 at PFC1262, 1263, 1266,

---

[2] Ex 5, Glen Piner's Deposition Excerpts (Piner Dep) at 20.

2

1268, 1277-78, 1279. One email stated that "Jason Meinelt understands the importance of customer service and exemplifies what it means to care about his job." Ex 6 at PFC 1277-78.

As a manager, Meinelt had a broad array of duties involving employee supervision and scheduling, inventory and ordering products, customer service, and financial reporting. Ex 8, Jason Meinelt's Declaration (Meinelt Dec.) at ¶4. Meinelt reports there was never any downtime. *Id.* One of Meinelt's many duties as a manager was to monitor the employees' time reports – to see whether they accurately recorded the beginning of their work day and the time at which they stopped performing duties for the employer. *Id.* P.F. Chang's instructs its supervisory personnel to closely monitor employee clock in and clock out times so that its employees are paid for only those hours they work. Its management training guide in fact advises managers to "Check the POS [Point of Sale] to be sure all Employees are clocking in and out at the correct time. Monitor through the end of the shift and *edit incorrect times if needed*." Ex 6 at PFC 2216 (emphasis added).

The reason for this direction was understood by all. Sometimes servers forgot to clock out; sometimes they sat down and ate a meal at the end of their shift[3] – before clocking out, and sometimes they stayed late to hang out and shoot the breeze with their co-workers. Meinelt Dep. at 12, 33-34, 36. When Meinelt noted that changes were necessary to the computerized time records, he explained his changes to the employee and gave them an opportunity to disagree with his assessment. *See, e.g.*, Meinelt Dep at 20; Thomas Decl at ¶4. And, as with all his other tasks, Meinelt approached this task diligently.

---

[3] Piner admits that employees sometimes forget to clock out for their meals. Piner Dec. ¶5.

3

Indeed, precisely because of his record of dedication and hard work, Meinelt was being groomed for advancement. Brown Dec. at ¶ 3; Brown Dep. at 93-94; Meinelt Dec. at ¶3.  His manager Mike Brown delegated budgeting and financial analyses to help Meinelt prepare for increased responsibility. Meinelt Dec. at ¶3.  And, as many P.F. Chang's employees know firsthand, the company is one where advancement is possible.  Meinelt Dec. at ¶2; Brown Dep. at 93-94; Piner Dep. at 36.  All the key players who will testify at trial for the defendant are living examples of that.  If you work hard, your work will pay off.

But hard work and dedication could not protect Meinelt from discrimination once the company learned he had a brain tumor.  Indeed, Piner quickly ushered him out the door for editing employee time – which Piner admits was a common practice. Piner Dep. at 63 ("It's not uncommon to do that daily."); 146.

Meinelt's health concerns began in the fall of 2008, when he noticed a problem with his hearing in his right ear. Meinelt Dec. at ¶5. Over the next nine months the problem got much worse. *Id.* And, finally, on June 8, 2009, he learned the reason.  The pain and hearing loss was caused by a tumor on his brain near his right ear. *Id.*

As soon as he received the news, Meinelt notified Brown of his condition. Brown Dep. at 85-87, Brown Dec. at ¶ 4, Meinelt Dep. at 67, 69.  Meinelt was not sure exactly when surgery would take place, but thought it might be in August. Brown Dec. at ¶4.  He made sure to do the right thing and tell his boss about his situation.  *Id.*  Brown, in turn, called his supervisor Piner on June 8 and told Piner about Meinelt's brain tumor and the need for surgery. *Id.*  Immediately, Piner was looking ahead to Meinelt's absence.  *Id.*

Piner's response was both swift and devastating to Meinelt.  He came to Houston on June 10th, conducted an audit that focused solely on Meinelt, and decided to fire him that same day for editing employee time.  Ex 6 at PFC 130. He called Meinelt on the afternoon of June 10th to summon him to a meeting.  Meinelt was undergoing medical tests, however, so they set the meeting for the morning of June 11th. Piner Dep. at 156, 158.  Piner's boss, Art Kilmer, attended as well, since he happened to be in town. Ex 9, Art Kilmer's Deposition Excerpts (Kilmer Dep.) at 34.

At the meeting, Piner told Meinelt was being dismissed for editing employee time. Meinelt Dep. at 21.  Meinelt was shocked. Meinelt Dec. at ¶6.  He could not understand why Piner was singling him out.

A.  I told him that I didn't really understand where this was coming from, that this was a practice, you know, that was very loosely based, that everybody did it, all the other managers did it, the manager before me did it.  And I didn't understand why I was being fired, and I didn't understand why I was being singled out.

Q.  Did Glen respond to any of that?

A.  Yes.  He said that it was because I had done it more than everybody else.  He understood that it went on, but I did it more.

Q.  Did he explain to you or did you ask him what he meant by "did it more"?

A.  Let me think about that one.  Not really, no. He just said that I edited people's times more than other managers.

Q.  Okay. ... did he ever get into the details as to what kind of editing he felt you did that led him -- that led the company to decide to terminate your employment?

A.  No, sir.

Q.  Did he explain to you which kinds of edits that he thought were too much that led to your termination?

5

A.  No, sir. ...  I told him that I didn't understand why -- I mean, I was very confused at the time of what was going on, to be honest with you.  I didn't understand what he meant by, you know, "too much."  He didn't go into any  details of the good edits or bad edits or whatnot.  He basically was just telling me I was terminated for editing time.

Meinelt Dep. at 20-23.   While Piner and Kilmer claim that they did not know Meinelt had a brain tumor when the meeting began,[4] they admitted just the opposite to Meinelt.  Meinelt Dec. at ¶7.

### The (Various) Stories According to P.F. Chang's – and the Flaws Therein

When called upon to explain this abrupt termination of a good employee, the defendant has a number of post-hoc explanations.  The defendant's stories, each one of them, fall apart under analysis – and according to the evidence.

1. Was Time Editing Unusual? No. Piner himself admits that all the managers under his supervision edited time when it was appropriate. It was, he agreed, a common practice. Piner Dep. at 64, 146.  And the reasons for it are undisputed as well. Everyone involved in the process admits that there are times when employees do not accurately clock in or out. This testimony comes from the servers themselves,[5] from the first line managers,[6] from Piner's boss,[7] and from Piner. Piner Depo at 146.  Shaun Thomas, who worked under Meinelt and whose time Meinelt edited on multiple occasions, agrees it "was a very common practice. Sometimes employees, including myself, just forgot to clock out when their shift was over. Sometimes I would call

_____

[4] Piner Depo at 109-110; Kilmer Dep. at 61.

[5] Thomas Dec. at ¶4; Bersola Dec. at ¶5.

[6] Brown Decl at ¶5-6; Meinelt Dep. at 12.

[7] Kilmer Dep. at 113-114.

6

Jason on my way home and tell him I forgot to clock out. Sometimes, he would tell me later that I had forgotten to do so. It was totally above board."  Thomas Dec. at ¶ 4.

Charles Bersola, who also worked as a waiter under Meinelt, agrees:  "Jason would tell me that he was going to edit my time because of this situation. It was all upfront. I can assure you that I would have objected if someone had actually removed time that I really worked[.]" Bersola Dec. at ¶ 5.

2. <u>Did Meinelt's Editing Practices Change Over Time? No.</u>  Meinelt's practice of editing time when employees were not working was consistent throughout his four years as a manager. Meinelt Dep. at 20. He made edits where needed, just as he was instructed by the man who trained him, Bill Kirk, and just as his supervisor Brown did for years. Meinelt Dep. at 13, 35. Meinelt personally observed Kirk edit time reports, and personally observed Brown do so as well – particularly when employees were still on the clock but not working – a practice called "riding the clock."  Meinelt Depo at 83-84. Both Meinelt and Brown recall their time being edited in a similar manner back when they were servers. Meinelt Dep. at 31-32;  Brown Dec. at ¶ 5.

3. <u>Was The Editing News to Piner? No.</u> Piner audited the records of each of his restaurants, including the report of time edits (called edited punches report), every six months. Piner Dep. at 33.  He admits to having performed five of these audits in the years before learning that Meinelt had a brain tumor. Piner Dep. at 35. But now P.F. Chang's asks this Court to find, as a matter of law, that Piner never before noticed that Meinelt engaged in this practice – not until June 2009, after he learned of Meinelt's brain tumor.

4. <u>Did the Audit Show Only Meinelt Editing Time? No.</u>  Piner concedes that edits are made every day for any number of reasons. Piner Dep. at 63.  And a look at the edited punch

7

reports confirms this.  At 10:25am Piner ran a report of the edited punches from all managers

from May 22 to June 1. Ex 6 at PFC 1234.  The first name on that report is Michael Brown and it

clearly shows Brown making an edit to subtract exactly two hours from an employee's time. *Id.*

(also showing edits by Taron Ducree and Adrian Restrepo).

But even though Brown was the first name on the list, Piner scrutinized only Meinelt's

edits. Piner Dep. at 77-79, 128; Kilmer Dep. at 69 ("the focus certainly was on Jason"). And,

after looking at them, Piner claims that he checked them against the check-out slips of the servers

whose time he was editing.  However, he admits that he did not pull check-outs slips to compare

with any other manager's edits. Piner Dep. at 88, 117.  So while Piner is adamant that Meinelt

wrongly clocked people out before their check out time,[8] he made sure not to check what other

managers were doing.

Piner claims he showed checkout slips to Michael Brown on the day of the audit.  Piner

Dep. at 50, 102.  But Brown says that never happened. Brown Dep. at 56.  Nor did Piner ever

show or discuss with Meinelt any of the check-out slips that he had allegedly pulled. Meinelt

Dep. at 25-26.

5. <u>Should Meinelt Have Adopted a Different Approach? No.</u>  Although Piner in hindsight

claims Meinelt should have disciplined the employees who were "riding the clock," no policy

suggests such an approach. Brown Dep. at 23, 33-34; Kilmer Dep. at 114; Piner Dep. at 164.

And, as a manager, Meinelt knew it was important to pick his battles. Meinelt Dep. at 41

("[Riding the clock] was -- it really wasn't a big thing.  It was one of the smaller things to be

---

[8] While the defendant claims that Meinelt and Brown admitted what Meinelt was doing
was improper, that is simply another factual error.

concerned about during a shift."). When employees were relaxing after a hard day waiting tables, he chose not to chide them for not clocking out first. This process went on for years – with no objection from Piner. Both Meinelt and Brown edited time back to the point where the employee actually stopped working and then confirmed with the waiter then or the next day. Meinelt Dep. at 19-20; Brown Dep. at 23-25; Kilmer Dep. at 113-114 (confirming this is proper protocol).

6. <u>Was Meinelt's Tumor Unknown to P.F. Chang's at the Time of Termination? No.</u> While Piner now denies knowing about Meinelt's brain tumor before the termination meeting, the defendant admits otherwise. Its position statement to the EEOC acknowledges that "Brown had informed Piner that Meinelt had been diagnosed with a tumor a few days prior to Piner's audit[.]" Ex 6 at PFC35. The defendant's request for judgment based on Piner's change in stories is without merit. At best, it has identified a genuine issue of material fact – especially given the evidence that Piner was the source of information for the position statement. Piner Dep. at 216. The jury, essentially, will be asked to choose between what Piner said, and what Piner said.

7. <u>Did Piner Conduct a Thorough, Professional Audit? No.</u> In reading the defendant's description of the audit Piner conducted on June 10th, one would think Piner had embarked on a careful and objective investigation of Meinelt's supposed misconduct. But that is not the case. It took Piner only a couple of hours to run and purportedly review a number of reports, conclude that they reflected wrongdoing only by Meinelt, speak to his boss and Claudette Gelb in HR, and make his decision. Piner Dep. at 42 (started between 9 and 10 am); Ex 6 at PFC 1243 (last report ran at 11:43am), PFC 130 (decision made shortly after that). Rather than conducting a careful investigation, Piner rushed to judgment – and discarded any information that stood in his way.

9

He did not investigate anyone else's practice's – only Meinelt's. Piner Dep. at 88.  He did not

share his written findings with his supervisor or HR. *Id.* at 104-105. He did not even tell them

that Meinelt had a brain tumor. Kilmer Dep. at 61; Ex 10, Claudette Gelb's Deposition Excerpts

(Gelb Dep.) at 55.  And he made dead certain not to question any employees about his suspicions

– not Meinelt, not any of the employees whose times was at issue, not even Brown. Piner Dep. at

85-86, 150.

       8.  <u>Did Piner Hold Others to The Same Standards? No.</u>  While Piner professes shock at

what Meinelt was doing, Piner was well aware – before the audit – that other managers were

editing time in ways he considered improper.  And he applied very different standards to their

misconduct.  On May 29, for example, he emailed Brown to say: "Can you go over the report for

edit punches for yesterday? I am a little concerned we might be trying to shave a minute here or

there? I do appreciate the effort..." Ex 6 at PFC 1272.  He was again looking at the edited punch

report the following Tuesday. He emailed Brown again to say: "We have got to have that talk

with chefs about backing out clock in times, they will lose there [sic] jobs if this continues!" *Id.*

at PFC 1273.

       These emails show more than Piner's knowledge of widespread time editing.  They show

he allowed managers a second chance even when he believed they were in violation of the rules.

*See also* Piner Dep. at 212-214. That is, unless they had a brain tumor.  Brown mentioned this

disparity of treatment on the day Piner fired Meinelt: "I questioned him about why two weeks

earlier James -- Chef James and Chef Taron had gotten a slap on the wrist for the same thing."

Brown Dep. at 69-70.  Piner had no ready answer.

While Piner claims in this lawsuit that he was only concerned about Meinelt's practice of editing time in hour long blocks late in the evening, that is not what he told Meinelt. Meinelt Dep. at 20-23, 27.  It is not even what he told his staff.  Shortly after firing Meinelt, he wrote them that it is illegal to edit time, even for just "4 minutes." Ex 6 at PFC 419.  He claimed that it "is against the law for us to edit" either clock-out or clock-in times. *Id.*  And he sternly warned that, "You can and will lose your job for doing any of the above." *Id.* Acknowledging that he was changing the rules, Piner also wrote that, "[f]rom this point on," edits will have to be documented in a different manner. *Id.*

9.  <u>Did the Employees Agree with Piner's Assessment? No</u>.  Piner scheduled the termination meeting away from Meinelt's workplace, because he knew that the termination would not be received well by Meinelt's subordinates. Brown Dep. at 92.  And what happened after Meinelt's termination shows how right he was.  The very same workers from whom Meinelt was supposedly stealing time were so angered by his treatment that they threatened a walk-out on a busy Friday night in protest. Brown Dec. at ¶11; Bersola Dec. at ¶6.  Ironically, it was Meinelt who talked them out of it, advising that it would only punish a manager who had nothing to do with his dismissal. *Id.*

While the defendant continues to speculate mightily about Meinelt's purported wrongdoing, the defendant's witnesses admit that to this day they have not talked to even one employee who confirms Piner's speculation. Kilmer Depo at 37-38, 59-60; Gelb Depo at 91.

10.  <u>Has Piner Explained His Destruction of Documents? No</u>. On the day Piner decided to fire Meinelt, he ran two store-wide edited punches reports.  One – from May 22 - June 1 – he kept and compared against check-out slips at some point. Ex 6 at PFC 1234-1252  The other

from May 1 to May 20 – he largely discarded, keeping only page four. *Id.* at 1243.  When asked what became of the other pages, almost the first words out of Piner's mouth were, "I'm not sure where the pages are.  But I didn't destroy -- I didn't do away with anything." Piner Dep. at 121. As Shakespeare once wrote, he "doth protest too much methinks."  Hamlet, Act III, Scene II. Piner's defensiveness is understandable. The discarded records show, by his very admission, that Brown was doing the same thing for which Meinelt was fired.  Piner Dep. at 117-118. A reasonable inference is that Piner did not want this evidence available.

Piner cherry-picked records in a similar manner when providing documents to the Texas Workforce Commission (TWC) in an effort defeat Meinelt's claim for unemployment benefits. Ex 6 at PFC 2614-2627.  After admittedly seeing that the records showed red flags for Brown,[9] Piner provided the TWC with only 13 pages of a report that is at least 51 pages long. Clearly, he is comfortable with holding back relevant and damaging information when it suits his purposes.

11.  <u>Was Meinelt's Manager Ever Held Accountable? No.</u>   Even though it only took about two hours for Piner to 'get the goods' on Meinelt, Piner sat on his hands when it came to Meinelt's supervisor, Mike Brown.  According to Piner, he never would have done anything more had he not wanted to defeat Meinelt's claim for unemployment benefits. Piner Dep. at 64-65, 184.  But he did and so two weeks after Meinelt's termination  Piner started looking for more edited punch reports to send to the TWC. *Id.* at 64-65.

On June 26, 2010, Piner ran an edited punches report for April and May 2009. Ex 6 at PFC2614-2627. Piner claims it was not until then that he noticed some 'red flags' about Brown's editing. Piner Depo at 58-59.  But even after admittedly having proof that Brown was doing the

---

[9] Piner Dep at 58-59.

same thing for which Meinelt had been fired, Piner still contested Meinelt's unemployment claim. Ex 11 at Meinelt 83.  Of course, his knowledge impacted what he sent the TWC.  He threw away many pages of records to present a very skewed picture of time editing practices.

The facts strongly suggest that Piner never intended to even write-up Brown.  He says he planned on doing it at a meeting the two had on June 27th, but "[b]ecame so engulfed in talking with Mike that I did not have a write-up form to write Mike up for his actions on the edit punches." Ex 6 at PFC392; Piner Dep. at 185-186.  He says his hands were tied without the right form - even though he could easily have gone across the street to get it. Piner Dep. at 190-191. And when asked why he did not write Brown up thereafter, Piner's testimony is even more unusual: "I can't write someone up if I'm not in town right there in front of them." *Id.* at 186.

Brown did eventually leave P.F. Chang's, but not because Piner suggested it.  He resigned in part because he did not want to work for a company that treats people the way Meinelt had been treated. Brown Dec. at ¶12. Brown gave notice of his termination, and still Piner did nothing. Piner Dep. 60-62. Piner claims he found even more cause for concern on Brown's last day, yet still he did not write him up. *Id.* Instead of taking any action, Piner listed Brown as eligible for rehire. *Id.* at 59.  But not Meinelt.  He listed Meinelt as "ineligible for rehire" and labeled him a thief. *Id.* at 164; Ex 11 at Meinelt 45

While P.F. Chang's seeks judgment as a matter of law on the argument that Piner's actions were untainted by any bias or discriminatory motive, another inference – one that is more consistent given the entire record – is that he was not going to let the facts get in the way of his conclusion. Indeed, when Thomas later told Piner that no time had been taken from him, Piner did not even respond.  Thomas Dec. at ¶ 4.

13

**Summary Judgment Standard**

P.F. Chang's is not entitled to summary judgment because that relief is reserved for cases where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Here there are certainly genuine issues of material fact, though the defendant studiously ignores them.  And the law is dramatically different than the defendant claims.

Summary judgment standards do not allow the defendant to cherry-pick the facts that it wants the Court to hear.  They instead require that all the evidence be viewed in the light most favorable to the non-movant, Jason Meinelt.  Moreover, the Supreme Court has counseled that, in reviewing a summary judgment motion, "[T]he court . . . must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 151 (2000).  Rather than honoring this rule, the defendant ignores all such evidence – even when it comes from its own witnesses.

Finally, the Supreme Court has made it clear that at the summary judgment stage the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment.  *Id.* at 255.  These standards require a jury trial.

**Summary of the Argument**

The defendant cannot obtain summary judgment on the issue of disability by relying on outdated case law.  But that is what it tries.  Nor can it succeed by deliberating misstating the plaintiff's obligations to present a prima facie case.  But it tries that too.  It even claims there was

14

no evidence of pretext when Piner and defendant's other witnesses disagree sharply on the important facts. When the defendant refuses to acknowledge the facts and the law that govern this case, it shows quite vividly why summary judgment is not appropriate.

## I. Argument and Authorities

The defendant's entire legal analysis of Meinelt's ADA claim relies on outdated case law. It steadfastly ignores Congressional passage of the ADA Amendments Act of 2008, which fundamentally changed how a disability is defined and became effective January 1, 2009.

**A. Prima Facie Case of Disability Discrimination**. The defendant first argues that Meinelt cannot prevail as a matter of law regardless of the facts. According to P.F. Chang's, an individual with a brain tumor who is losing his hearing is simply not someone with a disability. Even if he were qualified to seek protection from discrimination under the Americans with Disabilities Act, it next argues, he cannot win because he cannot point to a non-disabled employee who was treated differently under "nearly identical circumstances." Each argument is without merit.

(i) <u>The Applicable Law</u>. To prove liability under this statute, Meinelt must prove that he is a "qualified individual"[10] with a "disability" who suffered an adverse employment action because of that disability. *Brown v. Kastle Systems of Texas, LLC*, 2010 WL 3342219 at *7 (S.D. Tex. Aug. 25, 2010). Before the passage of the ADA Amendments Act, courts very strictly interpreted and applied the disability discrimination laws, resulting in scores of employees losing their claims because the term "disability" was defined so narrowly. All that changed effective January 1, 2009 – an historic event the defendant overlooks in its brief.

---

[10] This element is not contested by the defendant.

Under the law applicable to this case, Congress mandates that the courts construe "disability" "in favor of broad coverage" and "to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). The law expressly rejects the judiciary's earlier case law because the previous judicial interpretations of what constituted a "disability" created an "inappropriately high level of limitation necessary to obtain coverage."[11] The law is now explicit – the question of whether an impairment amounts to a disability "should not demand extensive analysis."[12] A court's analysis of the ADA must now shift away from the complicated side-show of whether someone is disabled, and instead focus on the real question: whether there was illegal discrimination.[13]

Except for a passing footnote reference, P.F. Chang's does not cite a single case that applies the broader protections afforded by the ADAAA.  It may as well cite admiralty cases, which are equally inapplicable to the legal issues at hand. *See Feldman v. Law Enforcement Associates Corp.*, 2011 WL 891447 at *7, n.3 (E.D.N.C., March 10, 2011) (pre-ADAAA cases "carry little, if any, precedential weight[.]")  It simply does not matter how hearing limitations or brain tumors were dealt with under the old ADA and the old caselaw.

Indeed, the few cases that apply the new ADA reveal how much the law has changed. *See,e,g., Lowe v. American Eurocopter, LLC,* 2010 WL 5232523 at *7-8 (N.D.Miss., December

---

[11] ADA Amendments Act of 2008 (ADAAA), Pub.L. 110-325, Section 2(b)(4-5), Sept. 25, 2008; §12102(4)(B)(incorporating findings and purposes of the ADAAA)

[12] *Id.* at 2(b)(5).

[13] *Id.* at 2(b)(5)("[I]t is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations[.]")

16, 2010 )("Based on the substantial expansion of the ADA by the ADAAA, Defendant's assertion that Plaintiff's weight cannot be considered a disability is misplaced."); *Chamberlain v. Valley Health System, Inc.,* 2011 WL 560777, *5 (W.D.Va. Feb. 8, 2011) (Under the ADAAA, plaintiff with a "visual field defect," that healed completely within one month is still able to survive summary judgment on the disability issue).

While P.F. Chang's motion ignores the law now in effect, the defendant's law firm, Jackson & Lewis, has recognized the significant changes this legislation would have in the courtrooms. As Jackson & Lewis assessed the legislation, the ADAAA "will make disposing of ADA cases prior to trial more challenging for employers." Ex 12, Jackson Lewis Legal Update, 9/25/2008. The firm also concluded that  "whether an individual's impairment rises to the level of a 'disability' ... will certainly be an easier standard to meet and, as a corollary, likely will not be a determinative factor in resolving summary judgment motions in an employer's favor." *Id.* Frank Alvarez, Jackson Lewis's National Coordinator for the Disability Practice Group, was even blunter: "Forget about trying to discern whether someone meets the ADA definition of 'disability' - it's a litigation issue at best, and, in most cases, a losing one." *Id.*

(ii) <u>PF Chang's Regarded Meinelt As Disabled</u>. The biggest change to the ADA is in the "regarded as" prong of the statute. No longer does a plaintiff have to prove that his employer perceives his impairment as limiting a major life activity. § 12102(3)(A). Now, it matters not whether Meinelt's impairment limited any of his major activities. If a plaintiff has an impairment – real or perceived by the employer – he is entitled to protection. § 12102(3)(A). A brain tumor and significant hearing loss fit the bill.

17

Indeed, there is no need to look any further than the defendant's own testimony to see that Meinelt was regarded as having a disability.  Several of the defendant's current and former employees, including Piner, acknowledge that they perceived Meinelt as having an impairment. As Piner put it, "All I knew at the time, the time the decision was made to terminate him, was Jason was at the doctor having tests run. He couldn't hear.  That's what I knew." Piner Depo at 110; Brown Dec at ¶ 4; *See also* Gelb Dep. at 79 (any type of tumor is a serious impairment); Kilmer Dep. at 144.

P.F. Chang's does not, and cannot, meet its burden to show itself entitled to a defense under the "regarded as" prong of the statute. To do so, it would have to prove that Meinelt's perceived impairments were both transitory and minor. §12102(3)(B); 76 Fed. Reg. 16978-01 at 16985[14]  (whether the impairment at issue would be "transitory and minor" is to be determined objectively). This defense is designed for passing illnesses like the common cold. 76 Fed.Reg. at 16981[15] (examples of "temporary, non-chronic impairments" that typically will not substantially limit a major life activity include "the common cold, seasonal or common influenza....") There is no evidence whatsoever that anyone even believed that Meinelt's brain tumor and hearing loss were minor and transitory impairments.

(iii) <u>Meinelt's Actual Disability</u>. In addition, the evidence is undisputed that Meinelt had an actual disability at the time of his termination. First, his major life activity of hearing was significantly impaired. §12102(2)(A). While he is now completely deaf in his right ear, Piner acknowledges that Meinelt's hearing was greatly diminished before he was fired. Piner Dep. at

---

[14] To be codified at 29 C.F.R. § 1630.15(f).

[15]  To be codified at 29 C.F.R. § 1630.2(j)(8).

18

110, 206. Second, having a brain tumor is a disability under the new law.  A tumor's very existence shows that cells are not growing properly and normal cell growth is a major life activity. §12102(2)(B). Gelb admits that "any type of tumor" is a serious medical impairment. Gelb Dep. at 79, 95; *see also* Brown Dep. at 87 ("[W]ith the brain tumor, we weren't sure if he was going to be able to make it back.")

**B. Alleged Work Rule Violations and The Absence of a Phantom Identical Twin.**

Even if it were to lose its motion under all these previous arguments, P.F. Chang's argues that it is still entitled to judgment as a matter of law because Meinelt cannot prove that "non-disabled employees were treated differently under nearly identical circumstances." (Dkt. 30, Motion at 12). This does not properly state the law. The courts recognize two methods of proving a prima facie case where an employer alleges violations of a work rule: either show that the plaintiff did not violate the rule, or show that employees outside the protected class also violated the rule but were not similarly punished. *Sagaral v. Wal-Mart,* 516 F.Supp.2d 782, 797 (S.D.Tex. 2007) (*quoting Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir.1995)).  Meinelt succeeds on both counts.

(i) Piner's Accusation that Mienelt Violated the Rules is not Credible. There is, at a minimum, a question of fact as to whether Meinelt's decision to edit time records in May 2009 violated P.F. Chang's rules. It is undisputed that P.F. Chang's own written policies tell supervisory personnel to "[e]dit incorrect times as needed." Ex 6 at PFC 2216.  The record shows that Meinelt followed this rule for four years, and was never once criticized for how or how often he edited time. He edited time records when necessary – just as his time was edited by his supervisor when he was a server and he saw it during his management training. (Meinelt Dep. at

30-32). And, he applied the same principles and followed the same methodology of editing servers' time as he observed of Michael Brown, his direct supervisor. *Id.* at 83-84. If this editing practice failed to raise eyebrows in any of the other years these managers were editing time, that is a sure sign that it was approved.[16]  Piner conducted his audits twice a year, yet never made a single negative comment about editing time – not until he learned that Meinelt had a brain tumor.

(ii) <u>Piner Knew That Other Supervisors Edited Time – And Cut More Time</u>. Piner knew that Meinelt was not the only supervisor editing time. The very report on which Meinelt's termination turned, according to Piner, showed that Brown too was editing time. See, e.g., Dkt. 30-2, Ex. 5 at 1567. When Piner told Brown that he would be firing Meinelt  – because (a) he had no choice and (b) Meinelt often edited time, Brown reminded Piner that editing time was standard practice. Brown Dec. at ¶ 6, 10.  Piner weakly tried to defend himself, saying that Meinelt did it more often. Brown explained that phenomena too – he told Piner that, since Meinelt was closing the restaurant, more time edits would be expected. Piner had no response to that. Brown Dep. at 51-52.

While Piner pretends to rely almost exclusively on the time reports from May 22 through June 1, 2009, in reaching his conclusion, he looked at other time reports as well. Ex. 6 at PFC 1243. And, the report for the first part of May shows that Brown edited more time than Meinelt, as did another Assistant Manager. *Id.* at PFC 1502-20.  Still, Piner sticks with his story.

---

[16] At the very least, there is a factual dispute on whether Meinelt's edits were improper. *See Martin v. J.A.M. Distributing Co.,* 674 F.Supp.2d 822, 835-837 (E.D.Tex. 2009) (plaintiff established a prima facie case of discrimination based on his termination for a work-rule violation that he arguably did not violate; denying summary judgment even though plaintiff did not establish that another employee was treated better under "nearly identical circumstances.")

Will a jury find all these excuses credible? Anything is possible. But, since an assessment of what really happened, when, and why turns on credibility, judgment as a matter of law is improper.

**C. Pretext**. In yet a third effort to convince the Court to dismiss Meinelt's case, P.F. Chang's argues – contrary to the majority of the evidence – that Meinelt cannot prove that its excuse for firing him was pretextual. Most of the evidence of pretext is discussed above, but presented here briefly along with pertinent case law. Pretext can be shown in many ways, but *Reeves* makes the math simple: prima facie case + sufficient pretext evidence to reject the employer's explanation = liability. 530 U.S. 133 at 149.

(i) <u>Mendacity</u>. Proving that the defendant is lying is a standard way to prove pretext, *Reeves* at 147, and this case has mendacity in spades. Here are just a few opportunities for a jury to find mendacity:

| | |
|---|---|
| P.F. Chang's, Michael Brown, and Meinelt: Piner knew Meinelt had a brain tumor at the time of his termination. Ex 6 at PFC 35; Brown Dec at ¶4; Meinelt Dec at 7. | Piner denies knowing about Meinelt's brain tumor at the time. Piner Dep at 109-110. |
| Brown: Piner claims he was ordered to dismiss Meinelt. Brown Dec at ¶9. | Gelb denies giving any such order. Gelb Dep at 56-57. |
| Piner claims that he was unaware that others were editing time in this fashion. Piner Dep at 110-111. | Brown says Piner knew. Brown Decl at ¶¶6, 10. Piner's emails say he knew. Ex 6 at PFC 1272-1273. The records he admits reviewing show this fact as well. *See, e.g., Id.* at 1234. |
| P.F. Chang's: It was a "collective" decision. Ex 13, Answers to 1st Interrogs, No. 4. | Gelb and Kilmer deny this. Gelb Dep at 56-57; Kilmer Dep at 141-42. |

The evidence is much less than conclusive as to who made the decision. And, when the three individuals pointed out by the company cannot agree on an answer, no one person's word is sufficient to justify judgment as a matter of law. *See, e.g., Coburn v Rockwell Automation, Inc.*, 238 Fed.Appx. 112 (6th Cir. 2007) (reversing summary judgment where employer's witnesses were unable to agree on who put the plaintiff's name on the RIF list: "If Rockwell cannot even give a straight answer about who recommended Coburn for the RIF list, it is trying to hide something").

Piner's selective retention of documents – discarding those that undermined his story – is another strong sign of mendacity. *See, e.g., Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 111 (2nd Cir. 2001) (at summary judgment enough circumstantial evidence exists to permit a reasonable trier of fact to conclude that the destroyed documents would show unlawful discrimination.)

(ii) <u>Refusing to Give the Benefit of the Doubt</u>. Piner never gave Meinelt, a well-respected employee with a good record, the benefit of the doubt. *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1159-1160 (10th Cir. 2008) (summary judgment reversed because, rather than giving the plaintiffs the benefit of the doubt, the company relied on only negative evidence and failed to interview key witnesses). There is no question but that Piner made a hasty decision, did not allow Meinelt to review and explain his edits, did not interview the affected employees to ascertain whether they agreed with the edits, and did not bother to ascertain any other supervisor's pattern of editing time. When it came to Brown's edits, Piner was content to ask his reasons and accept his explanations. Piner Dep. at 60 ("Now, when I approached Mike ... Mike goes, I -- they forgot to clock out. I trust my partners enough to trust them to do the right thing.")  And, with regard to

22

edits by other supervisors Piner speculates – without any evidence – that each edit was proper, explainable, and justifiable. Piner Dep. at 80, 82, 85. Some he refers to as "silly mistakes that could have been prevented." Ex 6 at PFC419.  But Meinelt never got that same benefit of the doubt. Piner Dep. at 85-86.

(iii) <u>Changing Stories.</u>  Inconsistent, shifting reasons offered by the employer constitute sufficient evidence of pretext to support a finding of liability. *See, e.g., Gee v. Principi*,  289 F.3d 342, 347-48 (5th Cir. 2002)*; Loveless v John's Ford, Inc.*, 232 Fed. Appx. 229 at *235 (4th Cir. 2007) (affirming jury verdict where the proffered explanation at trial – poor performance, contradicts reason given to the plaintiff at the termination meeting – desire for younger, more aggressive managers). The record provides unquestionable evidence that P.F. Chang's, and its witnesses, have changed their stories several times.  Even the identity of the decision-makers changes here: (1) HR mandated Meinelt's termination; (2) HR was not involved in the decision; and (3) it was a committee decision. *See Gee*, 289 F.3d at 348 ("after originally claiming that others were not involved in the selection process, Gibbs later admitted that he conferred with several people.")

The defendant's criticisms of what Meinelt allegedly did wrong also changed over time – from general at the time of the termination to mathematically analyzed by the time a summary judgment motion is filed. *See, e.g., Gee*, 289 F.3d at 348 (decision maker would not provide specific reasons at termination, but more detailed justifications arose later); *Pantoja v American NTN Bearing Manufacturnig Corp.*, 495 F.3d 840, 851 (7th Cir. 2007) ("Perhaps [the defendant] has a theory under which these various accounts are consistent...But all this shows only that there is a disputed issue of fact about the true reason.")

(iv) <u>Suspicious Timing.</u>[17]   Pretext is also shown by the suspicious timing of the termination. Here, there were only three days between the defendant learning of Meinelt's brain tumor and his termination. *See, e.g., Wallace v DTG Corp, Inc.*, 442 F.3d 1112 (8th Cir. 2006) (pretext shown in this retaliation case by showing there were only 15 days between the plaintiff's complaint of sexual harassment and the regional manager's decision to terminate her).

(v) <u>The Absence of a Clear Cut Policy.</u>  While the defendant appears to now claim that Meinelt too scrupulously followed its own written policy, there is ample evidence that others interpreted and applied that policy in the same way. *See, e.g.,* Brown Dep. at 23-24.  Piner never suggested that a supervisor could never edit the time records of more than a specified number of employees on any given shift. Nor did he ever say that, regardless of the facts, no supervisor could edit an employee's time by more than X hours. Brown and Meinelt say they edited time in accordance with the policy and past practices; Piner says their practice was improper. Only a jury can resolve this dispute. *Tomczyk v Jocks & Jills Rests., LLC.*, 198 Fed. Appx. 804, 812 (11th Cir. Aug. 9, 2006) (summary judgment reversed because there were contradictory pronouncements regarding the employer's policy against pay raises which called into question the employer's stated reason – that the plaintiff was fired for violating that policy).

**II. Meinelt's Pretext Evidence Applies with Equal Force to His FMLA Claim**

The defendant uses the same factual and legal arguments in its attempt to persuade the Court that it deserves judgment as a matter of law on the FMLA claim. Because the reason for

---

[17] Suspicious timing alone may not carry the pretext burden, but in combination with other evidence of pretext it can, and often does. *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999); *Evans v. City of Houston,* 246 F.3d 344, 356 (5th Cir. 2001).

Meinelt's termination remains hotly-contested, summary judgment is improper on this claim as well.

One argument unique to the FMLA claim is the proposition that Meinelt loses because he did not provide notice of his need for FMLA leave. That assertion of fact is incorrect. Meinelt Dep. at 66-67 ("Me and Michael Brown had a discussion that I was diagnosed with a brain tumor and I was going to need some time off, not knowing what the outcome would be.").  Brown conveyed this notice to Piner and the defendant admits he received it. Brown Dep. at 86-87; Ex 6 at PFC 35.

For obvious reasons, coverage under the FMLA does not turn upon whether an employee had the opportunity to obtain, complete, and turn in formal paperwork. As one court noted, "[I]t would be patently absurd if an employer who wished to punish an employee for taking FMLA leave could avoid liability simply by firing the employee before the leave begins." *Erdman v. Nationwide Ins. Co.,* 582 F.3d 500, 508 (3d Cir. 2009); *see also Tambash v. St. Bonaventure University*, 2004 WL 2191566, 11 (W.D.N.Y. Sept. 24, 2004).

Meinelt can also prove interference with an FMLA right regardless of the employer's intent. *Mauder v. Metropolitan Transit Authority*, 446 F.3d 574, 580 (5th Cir. 2006). That makes Meinelt's FMLA claim even less susceptible to summary judgment. And all of his pretext evidence from his disability claim is applicable to the FMLA claim as well. *See, e.g., Darboe v. Staples, Inc.*, 243 F.Supp.2d 5, 17 (S.D.N.Y. 2003) (the "tight temporal sequence" between the plaintiff's FMLA activity and his demotion establish causation).

## Conclusion

The plaintiff, Jason Meinelt, respectfully asks this Court to deny the defendant's motion for summary judgment. Summary judgment is inappropriate in this case because there are conflicting stories and someone has to figure out who is telling the truth. Even Glen Piner recognizes that:

> Q.   Well, somebody's going to have to figure out who's telling the truth: Is it you or Meinelt, correct?
>
> A.   Absolutely.

(Piner Dep. at 267).

Respectfully submitted,

/s/ Katherine L. Butler*
State Bar No. 03526300
Southern Dist. No. 4734
Paul R. Harris
State Bar No. 24059905
Federal I.D. No. 897365
1007 Heights Boulevard
Houston, Texas  77008
(713) 526-5677
(713) 526-5691 (fax)

* Lead counsel for plaintiff

## Certificate of Service

I certify that I am filing this document through the court's electronic filing system on this day, April 11, 2011, and that opposing counsel of record is a registered user of the system.

/s/ Paul R. Harris