**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JASON MEINELT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-10-0311 |
| | § | |
| P.F. CHANG'S CHINA BISTRO, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

In this disability discrimination case, Jason Meinelt has sued his former employer, P.F. Chang's China Bistro, Inc., for firing him after he told his supervisor that he had a brain tumor. Meinelt alleges that P.F. Chang's violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* This Memorandum and Order addresses two motions filed by P.F. Chang's:

- P.F. Chang's motion for summary judgment on both claims. (Docket Entry No. 30). Meinelt responded, (Docket Entry No. 34), and P.F. Chang's replied, (Docket Entry No. 37).


- P.F. Chang's motion to exclude the testimony of Meinelt's economic damages expert, Kenneth Lehrer. (Docket Entry No. 29). Meinelt responded, (Docket Entry No. 33), P.F. Chang's replied, (Docket Entry No. 35), and Meinelt surreplied, (Docket Entry No. 36).

Based on the record; the motions, responses, replies, and surreply; and the relevant law, this court denies the motion for summary judgment and the motion to exclude. The reasons for these rulings are explained in detail below.

## I.   The Motion for Summary Judgment

### A.   The Summary Judgment Record[1]

Meinelt was a manager at the Westchase P.F. Chang's in Houston, Texas from September 2005 until he was fired on June 11, 2009.  P.F. Chang's contends that it fired Meinelt for improperly adjusting restaurant workers' hours.  He claims the company fired him because he told his supervisor he had a brain tumor just three days before.

Meinelt began working for P.F. Chang's in 2004.  (Docket Entry No. 30, Ex. 2 at 10).  He was promoted to manager in September 2005.  (*Id.*).  Meinelt reported to Michael Brown, the "operating partner," at the Westchase restaurant.  (*Id.*, Ex. 1, ¶ 2).  Brown oversaw the day-to-day performance of all the restaurant's employees.  (*Id.*).  Glen Piner supervised Brown.  Unlike Brown and Meinelt, Piner lives and works in Dallas.  (*Id.*).  He oversees five P.F. Chang's locations in the

---

[1]   The summary judgment record consists of: Glen Piner's declaration, (Docket Entry No. 30, Ex. 1); the P.F. Chang's "charter," which hangs in each of its restaurants, (*id.*, Ex. 1, Ex. 1); Piner's December 7, 2007 e-mail to Michael Brown and others, (*id.*, Ex. 1, Ex. 2); a blank 2010 Store Financial Audit form, (*id.*, Ex. 1, Ex. 3); Piner's May 29, 2009 e-mail to Brown regarding the 2009 audit, (*id.*, Ex. 1, Ex. 4); Piner's June 2, 2009 e-mail to  Brown, (*id.*, Ex. 1, Ex. 5); a printout of time punches Piner reviewed in his 2009 audit, (*id.*, Ex. 1, Ex. 5); a report generated by the P.F. Chang's Aloha program for May 23, 26, and 29 2009, (*id.*, Ex. 1, Ex. 6, 7, 9)); Piner's June 11, 2009 e-mail to Brown and others, (*id.*, Ex. 1, Ex. 8); C.F.'s June 29, 2009 Personnel Status Form, (*id.*, Ex. 1, Ex. 10); excerpts from Meinelt's deposition, (*id.*, Ex. 2); excerpts from Arthur Kilmer's deposition, (*id.*, Ex. 3; Docket Entry No. 34, Ex. 9)); Glen Piner's deposition, (Docket Entry No. 34, Ex.  4; Docket Entry No. 34, Ex. 5); Claudette Gelb's declaration, (Docket Entry No. 30, Ex. 5); the Legal Compliance section of the P.F. Chang's Manager's Employee Handbook, updated February 2008, (*id.*, Ex. 5, Ex. 1); the P.F. Chang's equal employment opportunity, antiharassment, ADA accommodation, and FMLA policies, as set out in the February 2008 version of the Manager's Employee Handbook, (*id.*, Ex. 5, Ex. 2); Meinelt's Acknowledgement and Checklist, dated July 22, 2005, (*id.*, Ex. 5, Ex. 3); excerpts from Brown's deposition, (*id.*, Ex. 6; Docket Entry No. 34, Ex. 7); excerpts from Gelb's deposition, (Docket Entry No. 30, Ex. 7; Docket Entry No. 34, Ex. 10); Meinelt's responses to the Second Requests for Admission, (*id.*, Ex. 8); Meinelt's deposition, (Docket Entry No. 34, Ex. 1); Brown's declaration, (*id.*, Ex. 2); Charles Bersola's declaration, (*id.*, Ex. 3); Shaun Thomas's declaration, (*id.*, Ex. 4); Stephanie Cerasano's September 4, 2009 letter to the EEOC relaying the P.F. Chang's position on Meinelt's termination, (*id.*, Ex. 6); Meinelt's declaration, (*id.*, Ex. 8); a September 25, 2008 article about changes to the ADA by Jackson Lewis, L.L.P., (*id.*, Ex. 12); P.F. Chang's Objections, Answers, and Responses to Plaintiff's First Set of Interrogatories, Requests for Production of Documents and Requests for Admission, (*id.*, Ex. 13).

P.F. Chang's objects to the Bersola and Thomas declarations because Meinelt did not produce them before filing his response to the summary judgment motion.  (Docket Entry No. 37 at 2 n.2).  P.F. Chang's contends that "[f]airness dictates that they should not be considered now."  (*Id.*).  P.F. Chang's does not explain how the late disclosure is prejudicial.  *See* FED. R. CIV. P. 37(c)(1) (allowing use of undisclosed evidence, so long as such use is "harmless").

Dallas and Houston areas.  (*Id.*).  Piner reports to Arthur Kilmer, a regional vice-president for the company.  (*Id.*).

Among Piner's duties is a semiannual financial audit of each location he oversees.  On May 29, 2009, Piner notified Brown by e-mail that he would audit the Westchase restaurant on June 10.  (Docket Entry No. 30, Ex. 1, ¶ 7; *id.*, Ex. 1, Ex. 1).  The audit procedures include a random sampling of edits made to employees' time entries for checking and clocking in and out.  At the Westchase restaurant and other restaurants Piner oversees, hourly employees clock in using their identification numbers at any of several terminals in the restaurants.  (Docket Entry No. 30, Ex. 1, ¶ 5).  The employees use the same terminal to clock out at the end of the shift.  (*Id.*).  Before tipped employees clock out, they must check out.  (*Id.*, ¶ 6; *id.*, Ex. 2 at 29).  To check out, the tipped employee enters the evening's tips, prints a check-out slip, and delivers the slip to the manager on duty.  (*Id.*, Ex. 1, ¶ 6).  Only after checking out should a tipped employee clock out.  (*Id.*).  When an employee forgets to clock in or out, the manager is responsible for editing the time entries to show the hours actually worked.  (*Id.*).  These changes appear in an "Edited Punches Report."  (*Id.*).

It is P.F. Chang's stated policy, consistent with federal and local law, to compensate hourly employees for all hours worked.  The Manager's Employee Handbook, which Meinelt received, states: "Hourly Employees are to be paid according to state and federal Wage and Hour Guidelines.  It is therefore important that the management team ensures compliance with such laws to ensure that Employees are paid properly and in a timely manner for all hours worked."  (*Id.*, Ex. 5, Ex. 1 at PFC 00635).  The Employee Charter, which is posted at each P.F. Chang's restaurant, state: "Your Management Team will: Pay employees for all hours worked."  (*Id.*, Ex. 1, Ex. 1).  Piner e-mailed his operating partners periodically to remind them of this obligation.  For example, Piner e-mailed

his operating partners on December 10, 2007 about the importance of accurate timekeeping:

> I just want to pass along a WARNING TO ALL!!!  If I hear of any Man[a]ger/Chef allowing an hourly employee to work off of the clock or going back and editing their hours, is grounds for termination!!!  Also, it is against the LAW.  I can look at each and every one of you square in the eyes and honestly say I have NEVER EVER done that in my career in this industry!!!  I hope this practice is [not] going on in any of my restaurants!!!  I have not heard anything, but I just want to pass [a]long my feelings on this type of behavior and how I feel!  Also, it is against company policy!!

(*Id.*, Ex. 1, Ex. 2).  Eight days before the Westchase audit, on June 2, 2009, Piner sent Brown an e-mail stating, "We have got to have that talk with Chefs about backing out clock in times, they will lose [their] jobs if this continues!"  (*Id.*, Ex. 1, Ex. 4).

P.F. Chang's policies and procedures anticipate and allow managers' edits to employees' time entries.  A sample closing checklist updated January 23, 2009 recommends to managers that they "[c]heck the POS to be sure all Employees are clocking in and out at the correct time.  Monitor this through the end of the shift and edit incorrect times if needed."  (Docket Entry No. 34, Ex. 6 at PFC02216).  In his deposition, Piner described circumstances in which it would be appropriate to edit employees' time entries for clocking in and out:

> [T]here's going to be edits every day . . . .  There's good edits . . . that really are relevant.  People forget to clock in every day, people get to clock out.  People may go sit down and eat, they forget.  Things happen.   It's going to continue to happen forever. . . . [U]nfortunately, it's part of being in our industry, I guess.

(*Id.*, Ex. 5 at 146; *see also id.* at 73).  Meinelt testified that consistent with the practice Piner described, when an employee would leave the restaurant without clocking out, Meinelt would call the employee and record the time the employee reported leaving.  (*Id.*, Ex. 1 at 20).

On June 8, 2009, Meinelt was diagnosed with a brain tumor.  (*Id.*, Ex. 2, ¶ 4).  He told Brown the same day.  (*Id.*).  Brown testified that Meinelt told him that surgery would probably occur in mid-August and that he could be out six to eight months.  (*Id.*, Ex. 7 at 86–87).  Brown testified that he notified Piner "immediately."  (*Id.* at 86).  Piner denies that he knew about Meinelt's tumor until he met with Meinelt three days later to fire him.  (Docket Entry No. 30, Ex. 4 at 109–10).

Piner began his audit two days later, on the morning of June 10, 2009.  He reviewed a random selection of edited punches between May 22, 2009 and June 1, 2009.  (*Id.*, Ex. 1, ¶ 8 & Ex. 6).  Some of the reports showed employee clock-out times before their check-out times.  (*See, e.g.*, *id.*, Ex. 7 at PFC01564).  Piner explained why the audit results led him to conclude that the edits were improper:

> I found that there was a very common practice that had shown up on a select range of dates that had shown consistently patterns of multiple employees having times backed out one hour at a time exactly.
>
> From there, I went and compared checkout slips to match the actual clock-out-time that had been edited, which was alarming to me because the clockout was prior to when their checkout was actually ran.  At this point, I ran an audit report which caused even more alarm that the restaurant closes at — I believe it closed at 10:00 at that time.  It may have been 11:00.  We had changed it.  I don't remember.  But then I noticed that there was a common practice going on that edit punches at 12:24 or 25 that night it — that's not usual for multiple employees.  That was not matching up.

(*Id.*, Ex. 4 at 50–51).  Piner revisited the issue later in his deposition:

> When I go through there and select a range of dates, things happen.  Employees forget to clock out.  Employees don't clock in.  It's not uncommon practice to alter or edit a time.  What would be alarming or concerning is when you see three, four, five employees exactly one hour, that raises a red flag.  If I see a minute or two minutes or 15 or 17 or 20 or even 30, honestly, there's probably some part of that that goes to that, that says, you know what, they probably forgot to clock

5

> out.
>
> When you see the practices that there is, in a row, multiple employees and it's exactly one hour, I'm sorry, . . . I've been managing restaurants 20 years, I've never seen anything like that.  That's not common.

(*Id.* at 57–58).  Piner testified that his conclusion that Meinelt had improperly edited employees' time resulted from the number and nature of the edits, not from talking to individual employees to ask what time they had actually begun or ended work on a particular day.  (Docket Entry No. 34, Ex. 5 at 73).  Piner testified that after consulting with Kilmer and P.F. Chang's human resources department, he decided to fire Meinelt the next day.  (*Id.*, Ex. 4 at 101, 104–07).

Meinelt testified that he was "completely baffled" when Piner told him that he would be fired.  (Docket Entry No. 34, Ex. 8, ¶ 6).  Meinelt told Piner that editing time "was a practice . . . that was very loosely based, that everybody did it, all the other managers did it, the manager before me did it."  (*Id.*, Ex. 1 at 21).  Meinelt testified that Piner told him he would be fired because he "did it more" than other employees, but Piner would not explain what he meant by saying that Meinelt edited time "more."  Meinelt testified in his deposition that he did not understand what Piner meant by "too much . . . He didn't go into any details of the good edits or bad edits or whatnot.  He basically was just telling me I was terminated for editing time."  (*Id.* at 23).  Meinelt testified that he "definitely" tried explain himself to Piner.  (*Id.* at 28).  "I told him that I didn't do any . . . improper edits, that . . . any time editing that I did, the employees knew about it.  And I didn't understand what he was saying.  I didn't understand where this was coming from.  I was shocked."  (*Id.*).

6

After firing Meinelt, Piner asked Brown to review Meinelt's edits to compensate employees at the Westchase restaurant for any hours winnowed by Meinelt. (Docket Entry No. 30, Ex. 1, ¶ 14). The company paid employees for 300 additional hours. (*Id.*). Two employees, Charles Bersola and Shaun Thomas, testified that they were did not believe Meinelt had improperly edited their time. (Docket Entry No. 34, Ex. 3, ¶ 5 ("I can assure that I would have objected if someone had actually removed time that I really worked, because I was working my way through college and I needed the money."); Ex. 4, ¶ 4 (describing Meinelt's edits as "totally above board")).

The audit reports also showed that Brown had edited employees' time records in a similar manner, but not as often. Piner testified that he did not notice Brown's edits when he fired Meinelt. Piner testified that he discovered Brown's edits approximately two weeks later, when reviewing additional audit results in connection with Meinelt's application for unemployment benefits. (Docket Entry No. 30, Ex. 4 at 58–62). Piner met with Brown on June 27, 2009 and told him that his edits were improper. (*Id.*, Ex. 1, ¶ 15). Piner testified that he planned to write Brown up for the improper edits but did not have the right form with him. (*Id.*, ¶ 16). Piner could have gone to the Westchase restaurant to print out the appropriate form but chose to go to a baseball game instead. (Docket Entry No. 34, Ex. 5 at 190). Brown testified that after Meinelt was fired, he decided to quit because he "just did not feel [he] could work for a company that treated Mr. Meinelt the way he was treated." (Docket Entry No. 34, Ex. 2, ¶ 12). He insists that his departure was "totally voluntary." (*Id.*). Piner testified that he discovered more improper edits on Brown's last day and "would have terminated him if it were not his last day and he was leaving." (*Id.*, Ex. 5 at 59).

P.F. Chang's contends it is entitled to summary judgment. Meinelt contends that disputed fact issues entitle him to a trial on whether he was fired in violation of the ADA and the FMLA.

### B.      The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf*, *Inc. v.  Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated

assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### C.     The ADA Claim

#### 1.     The Applicable Legal Standard

The ADA prohibits employers from discriminating "on the basis of disability in regard to . . . [the] discharge of employees." 42 U.S.C. § 12112. When a plaintiff attempts to prove discrimination through indirect or circumstantial evidence, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004). *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009) (citing *McInnis v. Alamo Comm. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000)). Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of discrimination. *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *Rachid,* 376 F.3d at 312. An ADA plaintiff must show that (1) he is disabled, has a record of having a disability, or is regarded as disabled, (2) he is qualified for his job, (3) he was subjected to an adverse employment action on account of his disability or the perception of his disability, and (4) he was replaced by or treated less favorably than non-disabled employees. *Chevron*, 570 F.3d at 615 (citing *McInnis*, 570 F.3d at 615). In cases involving alleged work-rule violations, plaintiffs "may establish a *prima facie* case by showing 'either that [they] did not violate the rule or that, if [they] did, [employees outside the protected class] who engaged in similar acts were not punished similarly.'" *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (quoting *Green v. Armstrong*

*Rubber Co.*, 612 F.2d 967, 968 (5th Cir.1980)); *see also Greene v. Potter*, 240 F. App'x 657, 660 (5th Cir. 2007) (per curiam) (unpublished); *Martin v. J.A.M. Distrib. Co.*, 674 F. Supp. 2d 822, 833 (E.D. Tex. 2009); *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F. Supp. 2d 653, 662 (S.D. Tex. 2008); *Simmons v. Rothe Dev., Inc.*, 952 F. Supp. 486, 490 (S.D. Tex.1997), *aff'd*, 132 F.3d 1456 (5th Cir. 1997).[2]  If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment decision.  *Cullwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006).  If a defendant can produce such evidence, the presumption of discrimination dissolves.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000); *Chevron*, 570 F.3d at 615 n.6.  The plaintiff must then identify or offer evidence to create a fact issue "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)."  *Rachid*, 376 F.3d at 312 (internal quotation and alteration marks omitted); *see also Cullwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (analyzing a Title VII claim under the modified approach).  In a mixed-motive case, if the plaintiff shows that illegal discrimination was a motivating factor in the challenged employment decision, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus.  *Rachid*, 376 F.3d

---

[2]    The Fifth Circuit developed this rule in Title VII cases.  The Fifth Circuit has recognized that "the ADA is part of the same broad remedial framework as . . . Title VII, and that all the anti-discrimination acts have been subjected to similar analysis."  *Miller v. Public Storage Mgmt, Inc.*, 121 F.3d 215, 219 (5th Cir. 1997) (citations omitted).  Courts have applied the Title VII work-rule analysis in ADA cases. *Jones v. Potter*, Civ. A. No. 06-0048, 2007 WL 2071613, at *11 (E.D. La. July 16, 2007);  *Mosley v. Potter*, 2007 WL 1100470, at *7 (S.D. Tex. Apr. 11, 2007).  When the plaintiff does not dispute that the violation occurred, he "must show that [noncomplaining] employees were treated differently under circumstances 'nearly identical' to [theirs]."  *Mayberry*, 55 F.3d at 1090 (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)); *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001).

at 312.  The plaintiff has the ultimate burden of showing a genuine dispute of material fact as to whether the defendant discriminated against him on the basis of the plaintiff's membership in the protected class.  *Reeves*, 530 U.S. at 143.

### 2.      Analysis

Under the ADA, a disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1).  P.F. Chang's first argues that Meinelt's brain tumor cannot be the basis of an ADA claim because it did not substantially limit a major life activity.  The relevant inquiry is whether Meinelt was disabled when P.F. Chang's fired him.  *Chevron Phillips Chem. Co.*, 570 F.3d at 618.  After a series of Supreme Court decisions interpreting the ADA, Congress passed the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, broadening the definition of "disability."  Congress found that the decisions "created an inappropriately high level of limitation necessary to obtain coverage under the ADA."  *Id.* § 2(b)(5); *see also* 42 U.S.C. § 12102(4)(b).  The ADAAA's effective date is January 1, 2009.  ADAAA, Pub. L. No. 110-325, § 8.  Although the statute is not retroactive, *EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009), Meinelt was fired on June 11, 2009.  The ADAAA's more expansive definition of "disability" applies.

Under the ADAAA, "a major life activity also includes the operation of a major bodily function, including but not limited to, . . . normal cell growth . . . [and] brain . . . functions."  42 U.S.C. § 12102(2)(B).  The disability test may be satisfied either by actually suffering an impairment that substantially limits a major life activity or "being regarded as having such an impairment."  *Id.* § 12102(1)(C).  P.F. Chang's relies on pre-ADAAA cases to argue that Meinelt's brain tumor is not a disability.  *See, e.g.*, *Branscomb v. Grp. USA, Inc.*, No. CV 08-1328-PHX-JAT, at *5–6 (D. Ariz.

Sept. 23, 2010) (holding that a benign brain tumor requiring three months' leave was not a disability). Meinelt pointed out that P.F. Chang's had relied on pre-ADAAA case law. P.F. Chang's responded in a footnote that the ADAAA "did not . . . render nearly two decades of case law extinct." (Docket Entry No. 37 at 12 n.13). P.F. Chang's does not, however, explain the relationship between that case law and the statutory amendments. Nor does P.F. Chang's explain how Piner's knowledge that Meinelt had a brain tumor — an abnormal cell growth — that would require brain surgery is insufficient to create a triable issue as to whether Meinelt was disabled or was regarded as disabled.[3]  *See* 42 U.S.C. § 12102(2)(B).

P.F. Chang's also argues that Meinelt has not made a *prima facie* showing that he was fired on account of his disability or the perception of it. This argument fails to take into account Meinelt's summary judgment evidence that he did not violate P.F. Chang's policies by improperly editing time entries. The parties agree that it would have been improper for Meinelt to edit punches to deny employees time they actually worked but proper to do so when the employees' clock-in and clock-out times did not represent the hours worked. Piner concedes that the amount of employee time Meinelt had edited was the only basis for concluding that he had improperly reduced employee hours. Piner reached that conclusion without talking to any of the employees at the Westchase P.F. Chang's restaurant. Meinelt testified that he verified the proper time with the employees whenever he edited their clock-in and clock-out entries. Meinelt submitted affidavits from two former P.F. Chang's employees whom the company offered to pay for hours that Meinelt had edited out. These

---

[3]   P.F. Chang's argues that denying summary judgment would mean that "any time a plaintiff informs a manager of an alleged health condition (and the manager, in turn, parrots what he was told by the employee — whether it is accurate or not), he or she would be automatically bestowed with a 'regarded as' claim." (Docket Entry No. 37 at 12 n.13). The ADAAA directs that the definition of disability "be construed in favor of broad coverage . . . , to the maximum extent permitted by the terms" of the law. 42 U.S.C. § 12102(4)(A). These concerns simply do not apply to an employee informing a manager of a brain tumor that required surgery.

employees testified that Meinelt did not improperly edit their hours.

P.F. Chang's relies heavily on several time entries in which Meinelt's edits put the clock-out time before the check-out time. P.F. Chang's notes that Meinelt conceded that it would often be improper for an employee to clock out before checking out. But that concession does not necessarily make Meinelt's edits improper. If, for example, an employee takes a meal break without clocking out, it would be appropriate to change the clock-out time even if it is before the check-out time. P.F. Chang's has not established, as a matter of law, that a clock-out time edited to precede the check-out time could not accurately reflect hours worked when an employee takes a midworkday meal break.[4]

---

[4]    After Kilmer testified that the punch reports showed that Meinelt's edits were improper, Meinelt's counsel asked Kilmer whether P.F. Chang's had checked to see if dinner breaks could account for the edits:

> A.    The documents we reviewed showed that Jason was backing employees' time up to a time prior to when they had run their checkout, which a checkout is performed when their last tables had paid out . . . . And there [is] activity on employees' numbers after the time that Jason edited their clock-out time to.

> Q.    So you're relying on the records — the pieces of paper themselves for this conclusion, correct?

> A.    Yes.

> Q.    You have not spoken, for example, to any of these employees, to find out if they were riding the clock, as it were?

> A.    No.

> Q.    You don't know if they had been sitting around having dinner and just forgot to clock out?

> A.    No.

> Q.    Would that change your assessment?

> A.    No.

> Q.    So even if Mr. Meinelt had not taken away any time that was actually worked, you still think he should be dismissed.

> A.    No.

(Docket Entry No. 34, Ex. 9 at 36–37).

Meinelt has made a *prima facie* showing.

P.F. Chang's has proffered a legitimate nondiscriminatory reason for firing Meinelt — its belief that he had improperly reduced employees' hours in violation of policy — and Meinelt has submitted competent summary judgment evidence disputing that he violated the policy or that P.F. Chang's had a reasonable good-faith basis to believe that he had done so. Meinelt has also submitted competent summary judgment evidence that at least one other manager acted similarly but was not fired. Brown testified that he was never disciplined for his edits of employee time and instead resigned because of how Meinelt was treated. Piner testified that he intended to discipline Brown but lacked the appropriate form to do so and chose to go to a baseball game with his family instead, and that it was pointless to discipline Brown once it was clear he intended to quit. But the record reflects that Meinelt was not eligible for rehire, while Brown was. Brown also testified that he told Piner that managers often edited time to accurately reflect hours worked and that Meinelt edited more time than other managers because he worked the closing shift. Although P.F. Chang's now argues that Meinelt's edits were improper, not merely voluminous, Brown and Meinelt both testified that when Piner fired Meinelt, the only reason given was the volume of edits. Piner did not ask any Westchase employee if his time had been improperly edited, and two Westchase employees testified that they were offered money even though Meinelt did not improperly cut their time. Meinelt's testimony that he had engaged in similar edits as long as he had served as a manager also supports an inference that Piner did not fire him because of the edits. Piner's supervisor, though maintaining that it was proper to fire Meinelt, conceded that if Meinelt had been editing time the

14

same way since becoming a manager, failing to notice it would have been an "oversight."  (Docket Entry No. 34, Ex. 9 at 73).

Finally, there is undisputed evidence of the temporal coincidence of Meinelt revealing his medical condition and the employer's decision to fire him.  The record contains ample evidence supporting an inference that Piner's belief that Meinelt had improperly edited time was not the reason he terminated Meinelt.[5]  Piner fired Meinelt only three days after Brown told Piner about Meinelt's tumor.  *See Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992) (considering suspicious timing as "one of the elements" supporting a finding of retaliation).

Summary judgment on the ADA claim is denied.

**C.     The FMLA**

**1.     The Applicable Legal Standard**

The FMLA applies to private-sector employers who have 50 or more employees.  29 U.S.C. § 2611(4).  An employee is eligible for FMLA leave if he has worked for a covered employer for at least 1,250 hours during the preceding 12 months.  29 U.S.C. § 2611(2).

An eligible employee is entitled to 12 work weeks of leave in a 12-month period because of, among other things, a "serious health condition" that results in the employee's inability to perform her job requirements.  29 U.S.C. § 2612(a).   The employer may require an employee to support a request for FMLA leave with a certification from a health care provider that includes information about when the serious health condition began, the probable duration of the condition, and the medical information known to the health care provider about the situation.  29 U.S.C. § 2613(a), (b).

---

[5]     To the extent that P.F. Chang's contends that summary judgment is appropriate because Piner was not the final decisionmaker, that argument is foreclosed by the Supreme Court's recent decision in *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1191–93 (2011).

An eligible employee who takes FMLA leave is entitled on returning to be restored to the original position or an equivalent.  29 U.S.C. § 2614.

Meinelt's FMLA claim has five elements: (1) he was an eligible employee under the FMLA; (2) P.F. Chang's was an eligible employer; (3) Meinelt was eligible for leave; (4) Meinelt gave notice of his intent to take leave; and (5) P.F. Chang's denied him benefits.  *Grant v. Select Specialty Hosp. — S. Dallas, Inc.*, Civ. A. No. 3:09-CV-1303-K, 2010 WL 3606029, at *2 (N.D. Tex. Sept. 15, 2010); *Schimek v. MCI, Inc.*, Civ. A. No. 3:05-cv-0045-P, 2006 WL 2252034, at *11 (N.D. Tex. Aug. 7, 2006); *Morgan v. Neiman Marcus*, No. 3:05-CV0079-G, 2005 WL 3500314, at *4 (N.D. Tex. Dec. 20, 2005).  Unlawful interference with FMLA rights includes termination before the employee has a chance to take leave.  *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508 (3d Cir. 2009) ("[I]t would be patently absurd if an employer who wished to punish an employee for taking FMLA leave could avoid liability simply by firing the employee before the leave begins.").  "If the plaintiff would have been terminated regardless of his request for leave, his interference claim cannot prevail."  *Brook v. Equilon Enters. LLC*, Civ. A. No. 4:09-CV-02418, 2011 WL 13658, at *9 (S.D. Tex. Jan. 3, 2011); *see also Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010); *Phillips v. Mathews*, 547 F.3d 905, 911–12 (8th Cir. 2008); *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877–78 (10th Cir. 2004); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).

### 2.    Analysis

P.F. Chang's first argues that Meinelt has failed to meet the third and fourth elements because he failed to request time off clearly and with sufficient specificity.  To request FMLA leave, an employee must "provide at least verbal notice" that he needs leave and of "the anticipated timing and duration of the leave."  29 C.F.R. § 825.302(c).  "An employee need not invoke the FMLA by

name in order to put an employer on notice that the Act may have relevance to the employee's absence from work." *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 852 (8th Cir. 2002) (quoting *Thorson v. Gemini, Inc.*, 205 F.3d 370, 381 (8th Cir. 2000)). "Under the FMLA, the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Id.* at 852. "In all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." 29 C.F.R. § 825.302(c).

In his deposition, Meinelt testified: "Me and Michael Brown had a discussion that I was diagnosed with a brain tumor and I was going to need some time off, not knowing what the outcome would be.  He told me that he was going to talk to [Piner].  I followed up with it.  He told me that he talked to Glen and that — not to worry about it, just to worry about myself."  (Docket Entry No. 30, Ex. 2 at 67).  Brown testified that Meinelt told him that the tumor would require surgery in August and could cause a six to eight month absence.  The statement informed Brown that Meinelt would need time off and the reason.  The statement also suggests that Meinelt would need the leave immediately and that he was unable to anticipate precisely when he would return to work.  The definiteness and specificity of this record evidence distinguishes this case from *Wilson v. Noble Drilling Services, Inc.*, 405 F. App'x 909 (5th Cir. 2010) (per curiam) (unpublished), on which P.F. Chang's relies.  In that case, the Fifth Circuit held that the plaintiff had not given sufficient notice.  The court emphasized that the plaintiff did not tell his employer that he would need leave, but only that "he 'might' need to take leave and that there was a 'possibility' that he would need to take leave."  *Id.* at 913.  The court also noted that the plaintiff never provided "details as to when he might take leave or how long that leave would be."  *Id.*  The plaintiff told his supervisor at one point

17

that he might need leave early in the year, but he continued to work through the beginning of the year without taking leave. *Id.* Here, by contrast, Meinelt testified that he would need leave immediately for medical treatment and that it was unclear when he could return to work. No one at P.F. Chang's requested further details. *See* 29 C.F.R. § 825.302(c). To the contrary, Meinelt testified that Brown told him to "not to worry" about leave but to "worry about himself." The record provides sufficient evidence that Meinelt gave adequate notice.

P.F. Chang's next argues that Meinelt's claim fails because his termination was unrelated to his request for leave. Its argument is the same as its causation argument against Meinelt's ADA claim. The argument fails for the same reasons set out in this court's analysis of Meinelt's ADA claim.

## IV.   The Motion to Exclude

P.F. Chang's moves to exclude the opinion of  Dr. Kenneth Lehrer, Meinelt's economic damages expert, that the court should award Meinelt $191,500 in front pay. Lehrer's opinion assumes that Meinelt would have remained an employee of P.F. Chang's until 2027 and would receive 3 percent annual merit increases, beginning with $49,500 in compensation for 2011. Lehrer projects that Meinelt would have received $27,500 in 2011 and  annual merit increases of 7 percent. Lehrer set 2027 as the damages cutoff because that is the point at which he estimates that Meinelt's pay from his current or future employer will catch up to his projected pay at P.F. Chang's. Lehrer's premise is that Meinelt's termination will negatively affect his ability to find equivalent employment and delay when he would work as a manager. P.F. Chang's primarily argues that Lehrer's projection of the length of Meinelt's employment and the effect of his termination is so unrealistic that this court should exclude his opinion on front pay.

### A.   Rule 702 Gatekeeper Role

18

Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." As a threshold matter, the trial judge must determine whether the proffered witness is qualified to give the expert opinion he seeks to express. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993). Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, training, or education. FED. R. EVID. 702. The court must determine whether the proposed expert's training or experience is sufficiently related to the issues and evidence before the court that the testimony will assist the trier of fact. *Primrose Operating Co. v. Nat'l Am. Ins.*, 382 F.3d 546, 562–63 (5th Cir. 2004).

The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc). The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [the reliability criterion] and of whether the reasoning or methodology can be applied to the facts at issue [the relevance analysis]." *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (quoting *Daubert*, 509 U.S. at 592–93). The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The court "must ensure the expert uses reliable

methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).  In making its reliability determination, the court should not decide the validity of the expert's conclusions, but instead consider the soundness of the general principles or reasoning on which the expert relies and the propriety of the methodology that applies those principles to the facts of the case.  *Daubert*, 509 U.S. at 594–95, 113 S.Ct. 2786; *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997); *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 600 (S.D. Tex. 2001).

### B.    The Front Pay Standard

The Fifth Circuit has recognized that "[f]ront pay can only be calculated by intelligent guesswork."  Because of the remedy's "speculative character," the Fifth Circuit gives "wide latitude" to district courts making this determination.  The Fifth Circuit has provided an open-ended list of factors to consider: (1) the length of prior employment; (2) the permanency of the position held; (3) the nature of the work; (4) the age and physical condition of the employee; (5) possible consolidation of jobs; and (6) the myriad of other nondiscriminatory factors that could have an affect on the employee/employer relationship.  *Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007).

### C.    Analysis

P.F. Chang's does not challenge the credentials of Dr. Lehrer, who has performed more than 1,000 economic analyses for litigation, but does challenge his methodology in this case.  The arguments P.F. Chang's advances concern impact the weight the testimony should be afforded, not whether the opinion is admissible.

Initially, this court notes that the speculative nature of Lehrer's opinion is "consistent with the very nature of front pay, which is inherently speculative.  As the Fifth Circuit has recognized, '[c]alculations of front pay cannot be totally accurate because they are prospective and necessarily

speculative in nature.'"  *Osborn v. Computer Sci. Corp.*, Civ. No. A-04-CA-158-LY, 2005 WL 5881949, at *4 (W.D. Tex. Oct. 20, 2005) (quoting *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 879 (5th Cir.1991)) (alterations in original).  P.F. Chang's argues that Lehrer's opinion as to the length of time that Meinelt would remain at P.F. Chang's is unreasonable in light of Meinelt's job history and modern trends of job mobility.  The factfinder — in this case, this court — can assess the credibility of that opinion when counsel for P.F. Chang's cross-examines Lehrer and in light of opposing testimony from the expert witness for P.F. Chang's.  *See Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1098 (N.D. Ill. 2001).

P.F. Chang's challenges Lehrer's "taint" theory that Meinelt would not be able to find similar employment after his employment as unsupported by any peer review or other guarantees of reasonableness.  In his deposition, Lehrer explained that after an employee is fired, especially for an offense such as altering employee time, it is difficult find equivalent employment.  The opinion is based on the commonsense notion that future employers are unlikely to look favorably on a termination for dishonesty.  The starting point for Lehrer's earnings estimate is the actual compensation Meinelt received in his first job after being fired.  P.F. Chang's argument that Lehrer's opinion is not sufficiently rigorous "relate[s] to the weight of [Lehrer's] testimony rather than its admissibility."  *Id.* at 1098.

Other courts have reached a similar result in the face of similar arguments.  In *Coleman v. Tyson Farms, Inc.*, Civ. A. No. 2:1cv403, 2011 WL 1833301 (E.D. Va.  Apr. 13, 2011), for example, the defendant employer argued that the court should exclude an expert witness's front-pay testimony.  The plaintiff had worked as a maintenance supervisor.  The expert witness's front-pay calculation assumed that the plaintiff would have worked thirty more years in that position and received increases in wages and benefits.  *Id.* at *2.  The expert witness's opinion assumed that the

plaintiff's replacement work would be in retail sales management, not as a manager. *Id.* The defendant argued that the opinion was too speculative to be admissible. *Id.* The court denied the motion to exclude, concluding that the defendant's arguments went to weight, not admissibility. *Id.*; *see also Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188–89 (2d Cir. 1992) (expert witness's assumptions that plaintiff would have continued to work for his employer for 17 years and would have received annual salary increases of 8.3 percent if not terminated went to weight, not admissibility, of the testimony).

       The motion to exclude Lehrer's front-pay testimony is denied.

**IV.**    **Conclusion**

       The motions for summary judgment and to exclude Lehrer's front-pay opinion are denied.

       SIGNED on May 27, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge
